UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| In re: Peak 3 Construction, LLC,<br>　　　　Debtor. | Case No. 17-34379-KLP<br>Chapter 7 |
| Bruce E. Robinson, Trustee,<br>　　　　Plaintiff, | |
| v. | Adv. Pro. No. 18-03046-KLP |
| Daniel McMurtrie,<br>　　　　Defendant. | |

### **MEMORANDUM OPINION**

Before the Court is the complaint filed by Trustee Bruce E. Robinson (the "Trustee") against Defendant Daniel McMurtrie ("McMurtrie"), seeking to recover amounts allegedly due to the Debtor, Peak 3 Construction, LLC (the "Debtor"). Trial on the complaint was held on September 24, 2019, after which the parties submitted proposed findings of fact and conclusions of law. Prior to trial, the parties also submitted two sets of stipulations. After considering the evidence and the argument of the parties, the Court finds that the Trustee is entitled to recover prepetition interest and attorney's fees from McMurtrie.

### **Jurisdiction**

The Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334(b) and the general order of reference of the U.S. District Court for the Eastern of Virginia dated August 15, 1984. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409.

## Facts

The Debtor was a small construction company operating in Richmond, Virginia, functioning as a general contractor handling residential construction projects. At all relevant times, John William Gray, III, ("Gray") was the Debtor's managing member and handled the Debtor's business and financial affairs.

In September 2015,[1] McMurtrie and the Debtor entered into a contract (the "Contract") under which the Debtor would perform certain renovations to a residence McMurtrie had purchased at 1706 Park Avenue in Richmond, Va. Under the terms of the Contract, the Debtor would "fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others. Scope of work to include interior renovation of 3 bathrooms, master bedroom closets, interior painting, stair tread and rail rework, assessment and potential relocation of interior structural column, as well as any additional work determined to be necessary or desired during the project." [Ex. 1, Contract, Art. 2.]

Article 3 of the Contract provided that the work should be substantially completed within ninety days of the date of the contract, "subject to adjustment of this Contract Time as provided in the Contract Documents," which were defined as the Contract and any change orders. Article 4 of the Contract set forth that the work was to be provided on a cost-plus basis, with the Debtor to receive a construction fee of 18% of cost. All changes to the work under the Contract "must

---

[1] In the Contract document itself, the actual date of execution is left blank ("This agreement is made this _____ day of September, 2015."), and there is not a date provided alongside the parties' execution signatures.

be in the form of a Change Order signed by the Owner, Contractor, and Architect if any" and each change order "shall also specify any resulting adjustments in the Contract Sum or Contract Time." Payment terms were contained in Article 5 of the Contract:

> A deposit of $5,000 is due upon execution of this agreement. The deposit amount will be deducted from the final invoice. The period covered by each Invoice shall be one calendar month ending on the last day of the month. Progress payments, less retainage 5%, shall be made to the Contractor for Work satisfactorily performed no later than fourteen (14) days after receipt by Owner of Contractor's completed Invoice. Upon Substantial Completion of the Work, Contractor shall submit a final Invoice to Owner. Owner shall pay to Contractor the entire unpaid balance of the Contract Sum and all held retainage no later than fourteen (14) days after receipt by Owner of Contractor's completed Invoice. Any payment not received by Contractor within fourteen (14) days after Owner's receipt of the applicable Invoice will accrue interest at the rate of one and one half percent (1.5%) per month or, if less, the maximum amount allowable under state law. Owner may, at its sole option and without creating precedent or waiver, approve the earlier release of retainage for Work that has been completed and accepted.

The other relevant term of the Contract addresses termination or suspension, either by the contractor or by the owner:

> The contract may be terminated by Contractor if the Work is stopped for a period of thirty (30) consecutive days or a period of delays, repeated suspensions, or interruptions of the entire Work by Owner which constitute in the aggregate more than one hundred percent (100%) of the total number of days scheduled for the Project or one hundred twenty (120) days, whichever is less, through no act or fault of Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with Contractor, if Owner has persistently failed to fulfill Owner's obligations under the Contract Documents with respect to the progress of the Work, and Contractor has given seven days' written notice to the Owner of the details of such failure. Upon termination of the Contract by Contractor, Owner will be liable to pay in full to Contractor for all portions of Work completed

and all materials purchased and any attorneys' fees, cancellation fees, restocking fees, or other fees associated with termination of the Contract.

The Contract may be terminated by Owner if Contractor persistently or repeatedly refuses to supply enough properly skilled workers or proper materials; fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between Contractor and Subcontractors; persistently disregards laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction; or is otherwise guilty of substantial breach of a provision of the Contract Documents. Owner shall give Contractor ten (10) days written notice of intent to terminate and allow Contractor to satisfactorily remedy any deficiencies. In the event the Contract is terminated and it is determined for any reason that Contractor was not in default, the termination shall be deemed a suspension for Convenience of the Owner and the Contract shall be reinstated and Contract Sum and the Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption. Adjustment of the Contract Sum shall include overhead and profit.

The Debtor began work on McMurtrie's renovation project (the "Project") soon after the execution of the Contract, although initial progress was hampered by the fact that certain demolition that was to have been carried out by a separate demolition contractor was not completed, leaving the Debtor to complete the demolition. This added ten days at the beginning of the Project before the Debtor could begin the work contemplated in the Contract. Throughout the Debtor's performance on the project, the scope of the Project changed, with various changes and additions requested by McMurtrie, sometimes through Larry Cooper ("Cooper"), whom Gray perceived to be McMurtrie's liaison, and sometimes through Mary Catlett ("Catlett"), the interior designer on the Project.[2] These changes, in

---

[2] Part of an email from Catlett to McMurtrie on November 2, 2015, shows the changing nature of the Project:

4

conjunction with the demolition delay, caused Gray to realize in mid-November that the Project could not be completed by Christmas.  Completion by Christmas was important to McMurtrie, who lived in California, because he wanted to have a place in Richmond for his entire family to celebrate the holiday together.

Gray testified that in mid-November, he communicated to McMurtrie via telephone that the Project would not be completed by Christmas.  He further testified that McMurtrie was displeased but did not terminate the Contract and did not threaten to do so.  McMurtrie testified that he did not learn of the Debtor's inability to timely complete the Project until early December, when he arrived in Richmond.

Gray sent an email to McMurtrie on February 9, 2016, outlining in a spreadsheet the job costs, both completed and remaining, "based on the current scope of work."  [Ex. 2]  There is no evidence that McMurtrie objected to the terms of the spreadsheet, although he did discuss potential future cost-saving areas for the project going forward.  Again, there was no discussion of a termination of the Contract.  The Debtor continued to work on the Project and sent an invoice in the amount of $106,432.45 to McMurtrie on February 15, 2016 (the "First Invoice").

---

> I know we discussed using a runner on the back stairs. There is a very dirty old carpet on the stairs now.  The wood underneath it is rough pine and can't be refinished.  We can pull the rug up and paint the stairs for now or we can have the floor guys put in hard wood.  It's more money to do it that way, although I don't have a hard quote. John says it could be up to 5k, but may be less. Thoughts?
> Powder room – there may be extra lead time on the metal stand for the vanity style we discussed.  If we really want to stay with that style, it may make sense demo [sic] the powder room after Christmas.  This way you will definitely have a functioning bathroom downstairs for the holidays.

[Ex. B] McMurtrie's response to the email requested that the dishwasher be replaced and that a trash compactor be installed. [Ex. B]

5

[Ex. 3] The First Invoice included a construction fee in the amount of $18,039.40, calculated at 18%. There is no evidence that at any time McMurtrie instructed the Debtor to cease work on the Project.

On February 25, 2016, Gray asked when he might expect payment on the First Invoice, as "I have a lot of money already paid out and need to still pay others." He also outlined, at the request of Cooper, some cost-saving measures and asked about the status of drawings for closets. [Ex. 4] McMurtrie responded on February 29 that he was making cuts in several aspects of the renovation and was not happy. [Ex. 4] On March 3, Gray again inquired about the status of payment and on March 12 advised that "I must stop work on your project until I have a clear understanding of the payments and have at least received payment for the outstanding invoice." [Ex. 4] McMurtrie responded on March 13 that he would discuss the matter with Gray on the weekend, as he was going to be in Richmond and would like to see the house, which he was considering selling.

As a result of the meeting with McMurtrie, Gray agreed to reduce the Debtor's 18% construction fee to 5% to enable McMurtrie to pay the amount due with the funds he understood McMurtrie to have on hand. [Tr. 51] Accordingly, on March 16, the Debtor sent a revised First Invoice, reducing the construction fee to 5%. Along with the revised First Invoice, the Debtor sent a second invoice that included additional costs and which also charged the newly agreed-upon 5% construction fee (together with the First Invoice, the "Combined Invoice"). The total for the Combined Invoice was $135,114.34, with a reduced total construction fee of

$5,010.94. An email from Gray accompanying the combined invoices advised McMurtrie that he should "let me know when the total amount due for the two invoices will be paid so we can discuss restarting the project." [Ex. 5].

In April 2016, McMurtrie made a partial payment of $40,000 to the Debtor. Also in April 2016, McMurtrie made a $30,597.00 payment directly to the plumbing supplier, Ferguson, after it allegedly requested payment from him directly and threatened to reclaim its materials from the project.

In July 2016, ostensibly in response to a request for an update on the status of payment, McMurtrie sent an email to Gray that said, "Be back next month and should have funding closed." No payment was forthcoming. In a September 2016 conversation, the last conversation between McMurtrie and Gray, McMurtrie once again advised that he was working to obtain funds to pay the Debtor.

In March 2017, eleven months later after making his only payment to the Debtor, McMurtrie paid three other of the Debtor's subcontractors on the Project; their claims totaled $ 16,055. McMurtrie testified that he paid them because he wasn't certain that they would be paid by the Debtor.

McMurtrie needed to obtain funding to enable him to pay the Debtor. He testified that had a line of credit that he needed to extend in order to pay the Debtor under the Contract. Also, in correspondence dated April 27, 2016, with a representative of one of the Debtor's subcontractors, Reynolds Lighting Supply Co., McMurtrie represented that he was seeking to obtain funding to enable payment to the Debtor. [Ex. D] He also stated in a July 2016 email to Gray that he was

7

working on obtaining funding  There is no evidence that this funding was ever obtained.

In April 2017, McMurtrie retained Sutton Knight to complete the Project and to perform additional work.  The parties have stipulated that McMurtrie "is entitled to a $5,000.00 credit for all work performed by" Sutton Knight.

On May 25, 2017, Gray submitted the Debtor's final invoice (the "Final Invoice") to McMurtrie.  In the email accompanying the Final Invoice, Gray advised as follows:

> Dan,
> The last information you gave at the end of September, 2016, was that the funding would be completed by the end of the week.  I have not been paid.
> Given the lack of communication since or payments, I am forced to assume at this point that you have no honest intention of paying for the work done at 1706 Park Ave.  I've attached an invoice for the amount currently due based on interest accrued and the contract amount of 18% fee. The invoices I submitted in March, 2016, are no longer valid.  The 5% fee was only an offer in the hope that the adjustment would thereby allow the invoices to be paid in a timely manner.  Since that has not been the case, and the invoices have not been paid to date, the contract amount plus contract interest is due.  I will expect a response and payment by June 5, 2017.

The total amount sought on the Final Invoice was $93,441.96, after crediting McMurtrie's $40,000 payment.  McMurtrie has made no payments to the Debtor since the April 2016 $40,000 payment.

The parties have stipulated that the total value of the work performed by the Debtor was $121,921 plus a $21,946 construction fee.  After subtracting the $5,000 deposit, the $5,000 credit for the work performed by Sutton Knight, the $40,000 payment, and the $46,652 paid directly to subcontractors, the remaining unpaid

8

amount, as stipulated by the parties, is $47,215, of which $25,269 represents actual costs incurred by the Debtor and $21,946 represents the Debtor's 18% construction fee.

The Debtor filed its chapter 7 case on August 31, 2017, and Bruce E. Robinson was appointed trustee in the case. On May 24, 2018, the Trustee initiated this adversary proceeding by filing a complaint (the "Complaint") seeking to recover damages under the Contract, including interest and attorney's fees, from McMurtrie. Having stipulated as to the amount remaining due under the Contract, the parties stated at trial that the only issues before the Court are the entitlement of the Trustee to prejudgment interest and attorney's fees.[3]

## Conclusions of Law

**Interest**. The Trustee argues that he is entitled to an award of prejudgment interest at the Contract rate of 1.5% per month beginning on February 15, 2016, the date of the First Invoice. McMurtrie argues that the Trustee is not entitled to prejudgment interest because the Debtor's claim against him was not liquidated when the Trustee filed the Complaint.

The parties agree that state law governs the Trustee's entitlement to prejudgment interest. In Virginia, an award of prejudgment interest may be granted at the discretion of the trial court. *Skretvedt v.Kouri*, 445 S.E.2d 481, 487 (Va. 1994). An award of prejudgment interest serves "to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is

---

[3] The Trustee stands in the shoes of the Debtor and can assert causes of action possessed by the Debtor. *Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Capital LLC)*, 716 F.3d 355 (4th Cir. 2013); 11 U.S.C. § 541.

9

entered, thereby achieving full compensation for the injury those damages are intended to redress." *West Virginia v. United States*, 479 U.S. 305, 310 n.2 (1987).

Under Virginia law, the trial court "may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence." *Tech. & Supply Mgmt. v. Johnson Controls Bldg. Automation Sys., LLC.*, Civ. Action No. 1:16-cv-303, 2017 WL 3219281, at *20 (E.D. Va. July 28, 2017) (quoting Va. Code Ann. § 8.01-832). "Whether and for what period to grant such an award are decisions committed to the trial court's discretion." *Id.* In exercising that discretion, a court should balance the equities of the case, weighing "the desire to make the prevailing party whole, including compensation for its lost ability to use the money to which it was rightfully entitled, [against] the losing party's right to litigate a bona fide legal dispute." *Id.*

McMurtrie argues that the amount of the Debtor's claim under the Contract was unliquidated and the amount was "difficult and time consuming to determine," thus making prejudgment interest inappropriate. He argues that Virginia law prohibits an award of prejudgment interest on a claim that is unliquidated, citing *Advanced Marine Enters. v. PRC, Inc.*, 501 S.E.2d 148 (Va. 1988), for the proposition. However, the entire commentary of the Supreme Court of Virginia in *Advanced Marine* relative to prejudgment interest was that:

> Generally, prejudgment interest is not allowed on unliquidated damages in dispute between the parties. *Skretvedt v. Kouri,* 248 Va. 26, 36, 445 S.E.2d 481, 487 (1994); *Beale v. King,* 204 Va. 443, 447, 132 S.E.2d 476, 479 (1963). However, the issue whether interest should be awarded, and from what date any interest should run, is a matter submitted to the sound discretion of the trial court. Code § 8.01–382;

10

> *Skretvedt,* 248 Va. at 36, 445 S.E.2d at 487–88; *Marks v. Sanzo,* 231 Va. 350, 356, 345 S.E.2d 263, 267 (1986).

501 S.E.2d 160. Thus, *Advance Marine* is not an absolute bar to an award of prejudgment interest when there is some question as to the amount at issue.

McMurtrie urges that there was a fluctuation in the amounts sought by the Debtor and that therefore he could not have known "what he owed at any point prior to this case being filed." However, the invoices prepared and submitted by the Debtor were clear. The only changes to the amounts claimed were to account for the payments made by McMurtrie to the Debtor's vendors on the Project and to address the agreed-upon changes in the construction fee. Even with the changes to the construction fee and McMurtrie's payment of outside vendors, determining the amount due at any time was simply a matter of mathematics. The Court is not persuaded that prejudgment interest is improper in this instance. Had McMurtrie paid the invoices submitted to him by the Debtor, there would have been no uncertainty as to the amount owed. He would not have needed to pay outside vendors directly and he would not have needed to renegotiate the construction fee. As a matter of equity, the fact that the Debtor agreed to a lower construction fee to accommodate McMurtrie should not be held against him.

On the other hand, the Debtor waited over four months to submit the First Invoice, which may have contributed to the inability of McMurtrie to make payment within 14 days of the invoice, as required by the Contract. The Court also notes that the Debtor, in addition to failing to timely submit the First Invoice, took no action to collect the balance due from McMurtrie between September 2016 and May

Document    Page 12 of 15

2017. These factors do not justify the denial of prejudgment interest; however, under the facts existing in this case, they do affect the amount that the Court will award.

The Debtor's lax approach to collecting a debt for which McMurtrie last made a payment in April 2016 persuades the Court that an award of prejudgment interest should not run from the date of the First Invoice. It would be inequitable to charge McMurtrie interest during the time when the status of the Project was unclear. Rather, the Court finds that prejudgment interest should run, at the 1.5% rate specified in the Contract, from the date that is fifteen days after the date of the Final Invoice,[4] about which, in an accompanying email, Gray communicated to McMurtrie that "I am forced to assume at this point that you have no honest intention of paying for the work done . . . " [Ex. 7] This 1.5% rate should be applied to the $47,512 agreed upon by the parties, as no subsequent events affecting the amount due occurred after the submission of the Final Invoice.[5] From an equitable standpoint, the assessment of interest will help to offset the costs that the Debtor incurred as a result of McMurtrie's failure to pay as required under the Contract, while not penalizing McMurtrie for the Debtor's somewhat lackadaisical approach to collection.

**Attorney's fees**. Without a contractual provision to the contrary, parties in Virginia generally bear their own costs of litigation. However, in Virginia,

---

[4] This allows for the fourteen days after the date of the Final Invoice during which McMurtrie could have paid timely.

[5] The record is unclear exactly when the Sutton Knight work was completed, but as the parties have stipulated a $5,000 reduction therefor and included it when calculating the $47,215 damages amount, the Court will allow the stipulation to govern.

"contractual provisions shifting attorneys' fees . . . are valid and enforceable." *Airlines Reporting Corp. v. Sarrion Travel, Inc.*, 846 F. Supp. 2d. 533, 536 (E.D. Va. 2012) (quoting *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 730 F. Supp. 2d 513, 518 (E.D. Va. 2010). Article 5 of the Contract is the only contractual provision that would entitle the Debtor to recover attorney's fees.

Under the terms of Article 5, the Debtor is entitled to attorney's fees if the Project was stopped because McMurtrie "persistently failed to fulfill [his] obligations under the Contract . . . with respect to the performance of the progress of the [Project]." The Debtor must have given seven days' written notice of that failure, and the failure must have caused a work stoppage of thirty consecutive days.[6]

The Trustee argues that all the conditions of Article 5 have been satisfied. The Court agrees. The Debtor, in the email accompanying the Final Invoice, gave the required notice to McMurtrie. [Ex. 7]. By the date of the Final Invoice, it was clear that the work stoppage had far exceeded thirty consecutive days, and this was caused by the lack of payment; no other plausible reason for the stoppage has been put forth by either party.

McMurtrie argues that an award of attorney's fees would be inappropriate because the stoppage was at least partially caused by the Debtor's actions, which would make Article 5 inapplicable. Specifically, he points to the failure of the Debtor to meet the Christmas completion deadline, the failure of the Debtor to

---

[6] Nonconsecutive stoppages could also trigger the terms of Article 5 in certain circumstances, that are inapplicable in this case.

submit change orders as required by the Contract, and the Debtor's delay in submitting the First Invoice, which contained charges for a period well over the one-month period articulated in the Contract. The Court has considered these factors but does not find them to be so material as to justify the denial of attorney fees under the Contract. Additionally, the conduct of the parties shows a waiver of the change order provision as well as a waiver of the timing and content of the First Invoice. There is no evidence that McMurtrie was troubled by those issues and thus withheld payment. There is no evidence that those issues caused any stoppage of the work. The only thing that caused the stoppage was the failure of McMurtrie to pay the amounts due to the Debtor.

At no time did McMurtrie complain to the Debtor about the quality of the work or threaten to terminate the Contract. Rather, the only reason put forth for his failure to pay the amount due in full was his inability to arrange financing. There is no cogent argument that any actions of the Debtor were a breach of the Contract that would excuse McMurtrie from performing.

## Conclusion

Based upon the above analysis, the Court finds that the Trustee is entitled to prejudgment interest at the Contract rate of 1.5% per month on the sum of $47,215, such interest beginning to accrue on the date that is fifteen days from the date of the Final Invoice. The Court further finds that the Trustee is entitled to reasonable attorney's fees for the action necessary to collect the amounts due under the Contract.

At the September 2019 hearing, the parties reserved the issue of the amount of damages. The Court has already determined the parameters of the liability of McMurtrie for interest, and all that remains is for the amount to be calculated in accordance therewith. As such, there is no need for further evidence on the issue of damages with respect to interest. As to attorney's fees, those damages will be determined at a future date, according to the schedule set forth in the Order issued simultaneously with this Opinion. Upon resolution of the final amount due to the Trustee, including interest and attorney's fees, the appropriate judgment order will be entered.

An order to this effect will be issued.

Signed: March 31, 2020

                                                        /s/ Keith L. Phillips
                                         United States Bankruptcy Judge

Copies:                                      ENETERED ON DOCKET: Mar 31 2020

Loc Pfeiffer
Kutak Rock LLP
901 East Byrd Street
Suite 1000
Richmond, VA 23219-4071

Brian H. Richardson
Kutak Rock LLP
901 East Byrd Street
Suite 1000
Richmond, VA 23219-4071

Kevin J. Funk
Durrette, Arkema, Gerson & Gill PC
1111 East Main Street, 16th Floor
Richmond, VA 23219